999 A.2d 507 (2010)
414 N.J. Super. 483
Daniel REICH, D.M.D., Plaintiff-Appellant,
v.
BOROUGH OF FORT LEE ZONING BOARD OF ADJUSTMENT, Defendant-Respondent, and
Einar Eric Swanson, in his capacity as Construction Official and Zoning Officer of the Borough of Fort Lee, and Borough Council of Fort Lee, Defendants.
DOCKET NO. A-1677-08T1.
Superior Court of New Jersey, Appellate Division.
Argued January 13, 2010.
Decided July 29, 2010.
*509 Ira E. Weiner argued the cause for appellant and intervenor SJT Holdings, LLC,[1] (Beattie Padovano, LLC, attorneys; John J. Lamb and Mr. Weiner, of counsel and on the briefs; Daniel L. Steinhagen, Montvale, on the briefs).
Joseph G. Buro, Teaneck, argued the cause for respondent (DeCotiis, FitzPatrick, Cole & Wisler, LLP, attorneys; Mr. Buro, on the brief).
Before Judges AXELRAD, FISHER and SAPP-PETERSON[2].
The opinion of the court was delivered by AXELRAD, P.J.A.D.
In this action in lieu of prerogative writs, plaintiff Daniel Reich, D.M.D., a periodontist, appeals from an order of the Law Division affirming the decision of defendant, Borough of Fort Lee Zoning Board of Adjustment (Board), interpreting the simultaneous occupation of the dental office by him and the existing endodontist to be an expansion of the nonconforming use, and denying plaintiff's variance application. The court found the Board did not act arbitrarily, dismissed with prejudice *510 plaintiff's complaint, and entered judgment in favor of the Board.
On appeal, plaintiff argues: (1) the Board erred in finding the addition of a second dentist in Dr. Tsoucaris' office constituted an expansion of a pre-existing nonconforming use requiring a variance; (2) plaintiff's variance application should have been regarded as a request for a conditional use rather than a request to expand a nonconforming use; (3) the Board acted arbitrarily and capriciously in denying his application when it had previously approved identical applications in the same complex; and (4) even assuming the proposal was an expansion of a nonconforming use, the Board acted arbitrarily, particularly in rejecting testimony of plaintiff's experts and accepting unsubstantiated lay testimony regarding parking. Based on our review of the record and applicable law, we reverse.
This appeal centers around the desire of Dr. Stephen Tsoucaris, an endodontist, to modify his existing lease with plaintiff, his periodontist tenant in the office condominium unit in Fort Lee (the Borough), to allow there to be an overlap in presence. The evidence presented is that Fountainview Gardens (Fountainview) is comprised of five separate three-story buildings in an R-5 garden apartment residential zone on Anderson Avenue, a heavily traveled thoroughfare. There are a little league baseball field and a park to the south of the complex and single-family residences directly across the street. The complex was constructed in the 1960s as rental units and was converted to condominiums in 1983. There are fourteen offices located on the ground floor of the various buildings, mostly of a medical and dental nature. The residential apartments are located on the upper two floors.
The occupation of the units as professional offices predated the enactment of both section 410-35A(5)(a) of the Fort Lee Zoning Code, which permits, as accessory uses, professional offices in apartment buildings located in an R-5 zone, provided they are "located on the ground floor and access to same is limited from within the building or structure[,]" and section 410-40, which established minimum parking requirements for that use. Specifically, section 410-40B established the off-street parking requirements for a medical or dental clinic or office to be "7 [spaces] for each medical practitioner, plus 1 for each employee in the maximum work shift or 1 for every 150 square feet, whichever is greater." All of Fountainview's professional offices are accessed through individual entries off Anderson Avenue, which feature a private vestibule enclosed on either side by an outer door facing the street, and an inner door which opens into the unit. As built, Fountainview provides limited parking available only to the residential unit owners; no parking is provided for the first floor commercial tenants.
In 2001, Dr. Tsoucaris purchased a 2200 square foot unit in building 1323 of Fountainview, one of the largest commercial units in the complex, and began operating an endodontics dental practice. Dr. Tsoucaris received approval for seven operatories (treatment rooms), in which he installed plumbing and electrical, but used only half the space in his unit, approximately 1100 square feet, which included three of the plumbed operatories.[3]
In 2003, Dr. Tsoucaris was issued a cease and desist order based on complaints that a second doctor was practicing in his office in violation of the unit's single certificate of occupancy (C.O.). He appealed to *511 the Board, explaining he was a sole practitioner with offices in New Jersey and New York and had hired an associate to cover his emergency patients in New Jersey on days he was not working there. According to the meeting minutes, though not codified in a resolution, the Board voted to adopt its attorney's interpretation that "[a]s long as 1 Doctor is occupying the practice at one time, it's a permitted use" as "you are allowed to have a medical office at that facility with one doctor practicing at one time. In a case of emergency [where the two were working there at the same time], that would violate the certificate of occupancy but that is an enforcement issue." The Chairman phrased the motion as "[t]here could be as many as he wants as long as it is one at a time."
Since September 2005, plaintiff has rented the subject property, primarily using one of the three operatories on Wednesdays and occasionally on Sundays when Dr. Tsoucaris was not practicing there. In 2006, plaintiff indicated a desire to increase his use of the premises, which would result in the two dentists occasionally overlapping in presence. Plaintiff and Dr. Tsoucaris intended to share the 2200 square feet of space, each occupying about 1100 square feet. In addition to the three existing operatories that Dr. Tsoucaris would continue to use, the two plumbed but unfurnished operatories would be equipped with chairs for plaintiff's use. Plaintiff would occupy one side of the unit, comprised of a laboratory, two operatories, an office and a reception area. The dentists would share a waiting area and a handicapped bathroom. No construction would be necessary to effectuate the plan and the physical footprint of the unit would not change. Dr. Tsoucaris operated his practice by appointment on Mondays, Tuesdays, Thursdays, Fridays and "some Saturdays," averaging about thirty hours per week. Plaintiff anticipated initially expanding his hours to include Friday appointments and contemplated hiring a receptionist, assistant and hygienist if his practice became successful.
On August 8, 2006, plaintiff applied for a C.O., which was denied by defendant Einar Swanson, the construction official, on the basis of the Board's 2003 interpretation, which he deemed to prohibit Dr. Tsoucaris from "increas[ing] the practice to occupy two practitioners."
On October 19, 2006, plaintiff filed an application with the Board, accompanied by a Development and Impact Statement explaining that he sought an interpretation of the construction official's decision and requested permission to operate his periodontics practice within the currently occupied dental office suite at Fountainview "as a permitted use within the Zone representing a non-expansion and non-intensification of the premises." He primarily relied upon the Board's prior analysis and interpretation reflected in the March 28, 1996 resolution adopted in In the Matter of the Application of Robert Poli D.M.D., Docket No. 5-96, granting approval to Dr. Poli to occupy 900 square feet of an 1800 square foot office space occupied by Dr. Stephen Haber (Unit 1319-C at Fountainview).[4] The decision was based on a finding the occupancy was not an expansion of a nonconforming use because no expansion of the area was proposed and the planned use and occupancy continued to be a dentist's office, thus entitling the applicant to a C.O. Plaintiff submitted the December 11, 1991 affidavit of John Gigante, the former president of Fountainview, which *512 Dr. Poli had submitted in support of his application, documenting the professional offices maintained there dating back to the early 1960s. He also provided a list of professional offices currently maintained at four of the Fountainview buildings.
At some point before the Board hearings, plaintiff was instructed by the Board attorney to amend his application to include a request for a "d" variance, N.J.S.A. 40:55D-70 d, as alternative relief due to the fact that Dr. Tsoucaris' office was not accessed through an interior lobby, but through an exterior entrance off Anderson Avenue.[5] Plaintiff thus amended his application to include a request for an unspecified variance as alternative relief.[6]
Hearings were held before the Board on March 13, April 11, and May 22, 2007. Throughout the proceedings, plaintiff's counsel consistently contended he was seeking a separate C.O. for plaintiff but did not need a variance because the underlying medical use was a permitted accessory use in the zone and he was merely adding another doctor to the office. He acknowledged the parking and interior access requirements were nonconforming but emphasized that the use of the premises was not changing. Counsel explained he filed the alternative request solely because the Board's attorney was of the opinion there could be a potential need for a "d" variance if there were an issue regarding whether the office complies with the interior vestibule requirement of section 410-35A.
At the various hearings before the Board, plaintiff and Dr. Tsoucaris testified. Plaintiff also presented the testimony of an architect, Vassilios Cocoros; a professional planner, David Spatz; and a traffic engineer, Craig Peregoy. Fountainview's Condominium Association appeared as an objector through its board president and a board member. A Fountainview resident who lived above Dr. Tsoucaris' unit also testified, as did a resident of a single-family home on an abutting street.
In addition to the facts previously stated, Dr. Tsoucaris testified that "the design of the office was always as such that a second specialist would be there [as] [t]he office was designed to be like a book, that two people could operate independently in their own space without interruption." He further testified it was always his intention to have a complementary specialty in the unit, and the specialties of periodontics and endodontics complement each other nicely. According to both Dr. Tsoucaris and plaintiff, the average length of time to treat a patient was about an hour to an hour and a half. Dr. Tsoucaris also explained that a row of cabinets about fifteen feet down the center, two hallways, and *513 two closets at the end of the hall basically separated the sections so each side had access to its own supplies and sterilization area.
Dr. Tsoucaris further testified that, other than Dr. Haber's unit, only one other office in the complex was of similar size to his, with the other offices ranging between 732 and 1037 square feet. He related that Dr. Haber's approximate 3600 square foot unit was divided in two ways, with Drs. Haber and Mendel sharing office space with one entrance similar to his, Dr. Lombardi having a separate office with a side entrance out of that space and Dr. Poli having a separate side entrance. He acknowledged that with the exception of the Dr. Haber suite, for the most part, there was only one medical professional in each office.
Spatz, plaintiff's planner, opined that plaintiff's proposal was identical to the Poli application approved by the Board in 1996, emphasizing the Board took notice that no off-site parking was provided by the then-existing dental office, which was a nonconforming use, but did not require the second dentist to provide additional parking. He testified that two additional dental practitioners were permitted by the Borough to operate in portions of Dr. Haber's office after the Poli decision without the need for Board approvals, variances or the requirement to provide parking.
Spatz alternatively set forth the reasons why plaintiff's application satisfied the positive and negative criteria for granting a "d" variance. He was of the opinion the site was particularly suited for the proposed use in view of the existing professional offices, the use being permitted in the zone, and there being no need for expansion of the building or commercial area. Spatz also asserted the use had a positive effect on the community and surrounding area. The planner further noted the office was located on the ground floor and was of the opinion it satisfied the essential "spirit" of the access requirement of the ordinance in that the unit is accessed from within closed areas and not from a door directly out onto the sidewalk. Spatz found no negative impact because the physical footprint of the unit would not change and explained that if an existing dentist hired additional employees, it would have the same effect as the proposal.
Although Spatz was originally under the impression only one doctor would be in the office at a time, upon further questioning, he testified he did not believe there was any substantial detriment to the public good, even with multiple dentists, because there was no change to the square footage devoted to the medical office use and the 2200 square feet was just being apportioned to allow two practices. Spatz further explained that Dr. Tsoucaris would not need Board approval to bring other partners into his unit and fully utilize the space or allow another medical professional to use the entire 2200 square feet, both creating the same condition as the proposal.
According to Spatz, the parking requirements of the ordinance would not come into effect "because it is the same 2,200 square feet devoted to medical use." The shared office space arrangement would not increase the intensity of the use and would not create any significant additional parking demand. Spatz elaborated that the impact and need for additional parking "comes from adding new offices in that building or new space."
Peregoy, plaintiff's traffic engineer, testified about the survey he conducted of on-street parking within 300 feet of the front door of Dr. Tsoucaris' office on a Wednesday and Friday in February 2007 from 9:00 a.m. to noon. Those days and hours *514 were selected because they were when it was expected plaintiff would be in the office. Using industry standards, Peregoy projected about four vehicles for the additional 1100 square foot office space[7] and related that, at the busiest time, there were twenty-two available parking spaces on Anderson Avenue. Peregoy thus concluded the addition of plaintiff's practice would have no negative impact from a parking perspective.
Peregoy acknowledged his observations were not made when the nearby park and baseball field were in use. Moreover, as the objectors informed the Board, the area had winter snow restrictions on overnight parking through 8 a.m. from November through March, which Peregoy recognized could have reduced the number of resident vehicles present during his observation.
Four members of the public spoke in opposition to plaintiff's application, with the Condominium Association represented by counsel. Three of the witnesses complained that parking was difficult in the area. Mr. Ignozzi,[8] the president of the Fountainview Gardens Condominium Association, expressed the belief the complex was built for residential use and he saw no need for more professionals than were currently there. He acknowledged that the medical offices' use of the complex predated its conversion from rental to condominium in 1983 and stated that none of the present doctors were in occupancy at the time. Ignozzi noted that most of the residents complain because of noise coming from doctors' offices and expressed general concern about a doctor who would be practicing on Sunday. He further related that he could "never . . . find a parking space when [he] want[ed] to."
John Radoian, a condominium board member, confirmed he had a parking space in the back of the building but complained that he could not find a parking space in front of his condominium if he returned from errands around nine or ten in the morning. He related that around that time the adjacent streets became crowded due to the doctors' usage. Radoian stated that four times a month there is no parking on one side of the street for the sweeper, referenced the overnight winter parking ban and noted that Peregoy did not discuss the heavy traffic in the area during inclement weather or during the pick-up and drop-off of school children.
Kyung Wang, who owns the unit above Dr. Tsoucaris, had complaints about the noise during the dentist's initial three-month reconstruction period and related that there were sporadic instances afterwards where there was unidentified noise coming from downstairs, which was not like a drill sound. He related that on several occasions there was noise early Sunday morning when plaintiff had office hours. Wang did not testify about regular noise emanating from the office as a result of its normal operations.
Joan Ado, who lived in a single-family home on Forest Avenue, an abutting street, testified that parking had been a significant and ongoing problem in the area as a result of the professional offices. She presented photographs taken mid-morning in March 2007 depicting her street on a typical day with cars parked "stern-to-stern," which she explained did not belong to her or any of the other four homeowners on the block, as none of the residents park on the street. Ado explained that she could not pull out of her *515 driveway with all the cars there and she could rarely get a spot on the street in front of her house. She further noted there were occasions when the town's leaf collection trucks could not access the curb due to all of the parked cars and expressed annoyance at the town for not supporting the residents and posting signs or issuing tickets. Ado observed Dr. Tsoucaris and his wife, as well as staff and patients of the medical offices, routinely parking on her street.
The Board found plaintiff's request for an interpretation amounted to an appeal of the township official's C.O. denial, and voted to dismiss the application as untimely. See N.J.S.A. 40:55D-72 a (requiring an appeal of a municipality's administrative officer's decision "based on or made in the enforcement of the zoning ordinance or official map" to be taken within twenty days). The Board also denied plaintiff's alternative request for a variance "to intensify a non conf[o]rming use." See N.J.S.A. 40:55D-70 d(2).
The Board memorialized its decision in a resolution dated September 11, 2007. It found all of the professional offices involved nonconforming uses because they could not be accessed from within the buildings and parking was insufficient, although an existing unit with an existing practitioner is not required to meet the current parking requirements because the use predated the ordinance. It noted the denial of the C.O. for the overlapping practitioner was based on the Board's adoption of its attorney's interpretation in 2003. The Board rejected the testimony of Corcoros and Spatz that plaintiff's proposal would not be an intensification of the preexisting use and credited the testimony of the residents on that issue. It found plaintiff failed to satisfy the N.J.S.A. 40:55D-70 d(2) requirements for a variance to expand or intensify a nonconforming use, stating the addition of a doctor, support staff and patients would not be particularly suited to the area as it would "intensify the use beyond what is appropriate for the area" and would impose on the surrounding residential neighborhood. The Board noted there were existing empty professional offices available to plaintiff in the complex. The Board was also concerned the approval would "open the possibility of all of the professionals adding doctors in their offices."
The Board concluded the record was "devoid of credible testimony on [plaintiff's part] regarding patient parking on or near the site and whether an additional dental practitioner would negatively impact the parking in the area." It rejected the parking study as unreliable because it took place "when no overnight parking was permitted in the area and on days when Doctor's [sic] offices were closed" and found credible the residents' testimony of an inability to find parking.
Plaintiff filed a complaint in lieu of prerogative writs against the Board, the Borough and its construction official, and thereafter dismissed the latter two parties. On or about February 28, 2008, the Board filed a notice of motion to Determine the Issues on Appeal, which resulted in an April 10, 2008 order defining the issues as follows:
a. Was the Board arbitrary, capricious and unreasonable in determining that the addition of Dr. Reich to the professional office of Dr. Tsoucaris was an expansion of a non-conforming use?
b. Was the Board arbitrary, capricious and unreasonable in denying the variance application?
Following oral argument, in a written opinion on October 16, 2008, and an order for judgment of the same date, the court disagreed with the Board that plaintiff's interpretation request was time-barred. *516 It concluded the Board did not act arbitrarily and otherwise affirmed the Board's interpretation that the proposal constituted a request to intensify a pre-existing nonconforming use and its denial of plaintiff's "d(2)" variance application, essentially adopting the Board's analysis. The court found Dr. Tsoucaris' practice was a nonconforming use because his office was not accessible from inside the apartment building and he did not provide any on-site parking, though the current parking ordinance required him to provide at least eight off-street spaces. The judge noted the Board had made three different determinations interpreting the ordinancethe 1996 finding that Dr. Poli's inclusion in Dr. Haber's office was not an expansion of physical area and thus not an expansion of a nonconforming use, the 2003 concurrence with its attorney's interpretation that Dr. Tsoucaris could have an associate in the office on his C.O. provided there was no overlap in presence, and the current finding that the overlap in Dr. Tsoucaris and plaintiff's practices would be an expansion of a nonconforming use.
Though recognizing there was no ordinance limiting the number of medical or dental practitioners in a professional office, the judge found the "restriction . . . on the number of practitioners flows from the parking requirements." The judge concluded the inclusion of plaintiff would result in an overlapping increase in medical practitioners and staff on the premises, which would increase the noise and activity on-site and additionally burden the parking in the area. He further noted that the existing nonconformity resulted in a deficiency of on-site parking spaces and an additional dental practice would result in a further deficiency of sixteen on-site parking spaces.
Citing the deferential standard of review, the court noted the Board's rejection of plaintiff's experts concerning the impact the variance would have on area parking, commenting about Peregoy's failure to consider whether the other medical offices were in use on Wednesday and Friday, during which time some Board members believed doctors are often off, and the Board's reliance on the residents' testimony about parking problems. Noting that plaintiff sought to occupy an office located in a residential apartment zone, the court found the record contained considerable evidence to support the Board's rationale for its decision, concerns about parking and the impact on the residential area. This appeal ensued.
On appeal, plaintiff challenges the Board's conclusion that the proposal constituted an expansion of a pre-existing nonconforming use requiring a variance. He alternatively argues the variance application should have been analyzed under the more lenient standards of a conditional use variance under N.J.S.A. 40:55D-70d(3) rather than the more difficult proof standard for a "d(2)" variance. Plaintiff also argues the Board was arbitrary in departing from the interpretation given in the Poli matter and, even assuming the proposal was an expansion of a nonconforming use, the Board's denial of the "d(2)" variance was arbitrary in light of the expert testimony. Among other arguments, the Board asserts as a procedural challenge that plaintiff cannot seek on appeal a variance other than that for which he applied. It further raises the argument, though not by cross-appeal, that the court erred in reversing the Board's ruling that plaintiff's interpretation request was properly dismissed as an untimely appeal.[9]
*517 A board's interpretation of an ordinance is not entitled to any particular deference and is reviewed de novo because "the interpretation of an ordinance is a purely legal matter as to which the administrative agency has no particular skill superior to the courts'." Jantausch v. Borough of Verona, 41 N.J.Super. 89, 96, 124 A.2d 14 (Law Div.1956), aff'd, 24 N.J. 326, 131 A.2d 881 (1957).[10] We are mindful that a board's decision to grant or deny a variance is presumed to be valid unless the challenging party can demonstrate a clear abuse of discretion and, as a general rule, we should not set aside such decision unless it was arbitrary, capricious or unreasonable. See, e.g., Cell S. of N.J. v. Zoning Bd. of Adjustment of W. Windsor, 172 N.J. 75, 81-82, 796 A.2d 247 (2002); Medici v. BPR Co., 107 N.J. 1, 15, 526 A.2d 109 (1987).
We reject plaintiff's argument that his access conformed with section 410-35A(5)(a) because entry to the office was through a separate vestibule area and not directly from the outside of the building. None of the buildings have a separate lobby entrance for the professional offices and thus all of the commercial units in the complex are pre-existing nonconforming structures. Whether the present arrangement of sharing space without overlap continued or plaintiff's application was granted, however, would not impact this nonconformity.
Professional offices are permitted as an accessory use in this zone and have existed on the first floor of the complex since prior to the time it became a condominium in 1983. The residential tenants were all provided with on-site designated parking but none was ever made available to the commercial offices. It is not disputed there has been a turnover of professional office tenants since the condominium conversion, including from one professional use to another, and at the time of the application the condominium association and a realtor occupied offices in addition to the medical professionals. Moreover, there has been a continuing turnover in tenants since section 410-40B was enacted establishing off-street parking requirements for medical or dental clinics and other professional offices.[11]
The Borough chose not to enact an ordinance limiting the number of professionals or staff in an office that is accessory to an apartment building. Thus, it is clear Dr. Tsoucaris could have brought in as many associates or partners and staff as he deemed necessary to utilize the 2200 square foot space in his unit, including the seven approved operatories, without further application to the Borough other than potentially for additional C.O.s.[12] In concluding that Dr. Tsoucaris was precluded from having an overlapping practitioner in his office, the Board apparently relied on the 2003 ruling involving Dr. Tsoucaris. That reliance was arbitrary under the circumstances. There was no basis expressed for the Board's interpretation, in *518 connection with the C.O. enforcement action, that Dr. Tsoucaris could not have an overlapping employee. Perhaps the rationale of the Board's attorney related to Dr. Tsoucaris' single C.O. Thus, Dr. Tsoucaris' acquiescence and initial lease with plaintiff for his use of the office only on the two days Dr. Tsoucaris was not there has no bearing on the validity of this application.
It is also logically and legally inconsistent that, in light of the purported noise and parking problems expressed by the objectors as caused by the professional offices, the zoning official and Board had no objection to plaintiff continuing to practice in the leased space two days a week but did not permit an overlap of use with Dr. Tsoucaris. The bases upon which the Board found the potential overlap constituted an intensification of the nonconforming use, i.e., the residents' desire to stem the increase of medical professionals in a primarily residential area and their problems with the current shortage of parking and occasional noise emanating from the office, such as on Sunday mornings, would seem to apply similarly to the presence of a second dentist in Dr. Tsoucaris' office on his off-hours.
Moreover, there was neither expert nor lay testimony by the objectors that the addition of Friday hours by plaintiff and overlapping of the periodontic and endodontic practices that day would intensify the activity on site, result in an increase in noise and place additional burdens on parking in the area. The residents simply complained that, overall, there was insufficient parking resulting, in part, from the professional office use in the complex. The Board's conclusion that the increase in number of medical practitioners on the premises at the same time occasioned by plaintiff's presence would intensify Dr. Tsoucaris' permitted dental office use disregards the endodontist's ability to increase his staff at any time, subject only to the limitations of the physical space.
There was also considerable lay and expert testimony presented by plaintiff that Dr. Tsoucaris' and plaintiff's dental specialties were complementary and had less volume and turnover of patients than, for example, the orthodontist operating five chairs in the other 2100 square foot office. Additionally, based on the essentially mirror image configuration of the unit, which lends itself to two practices, plaintiff's proposal would result in no additional footage or any change to the physical footprint of the unit. Plaintiff would simply have to equip two of the operatories with chairs. The increase in the volume of business alone is not ordinarily considered an expansion of a nonconforming use. See Hantman v. Twp. of Randolph, 58 N.J.Super. 127, 136, 155 A.2d 554 (App.Div.1959), certif. denied, 31 N.J. 550, 158 A.2d 451 (1960).
Furthermore, other than in Dr. Tsoucaris' case, the Board appears to have consistently permitted the addition of medical professionals in other offices without treating the circumstances as an intensification or expansion of any pre-existing use requiring a variance, notwithstanding the parking deficiencies. The prior grant of a variance to one property owner ordinarily does not create a precedent for a subsequent application by another property owner because of the frequent difference in the underlying facts. William M. Cox, N.J. Zoning & Land Use Administration, § 13.3 at 354 (Gann 2010). However, as the Cox treatise notes,
Nevertheless, over a period of years, certain patterns of decision become evident and in due course of time create a body of precedent. . . . The practice of referring to previous decisions helps to assure consistent principles in making determinations. . . .

*519 Where this practice prevails, it is not uncommon for applicants to point out to the board that their case is very similar to certain cases previously decided, and that since the relief was granted in the prior cases, the present applicant should likewise be entitled.
[Id. at 354-55.]
As relied on by plaintiff, in 1996 Dr. Poli's application to lease a 900 square foot portion of Dr. Haber's office was granted without use or parking variances based on a finding it did not result in an expansion of a nonconforming use because there was no expansion of area and the proposed use and occupancy was for a dental office, even though his addition to the office required at least seven more off-site parking spaces pursuant to the ordinance. Since that time, two additional medical professionals have rented other portions of Dr. Haber's office and were issued C.O.s without the need for any variances. At the time of the hearing, there were four dentists operating out of the 3600 square foot area. Application of the parking ordinance would require 52 off-street parking spaces for that office (3600 sq. ft. ÷ 150 sq. ft. = 24 spaces for staff + 28 spaces for the four dentists). § 410-40B. It appears the Borough and Board were satisfied that Dr. Haber's unit, which had no on-site parking, was grandfathered and not subject to the subsequent parking ordinance, as was the continued utilization of the property by the medical professional tenants.
Because Dr. Tsoucaris' unit will remain a dental office with the addition of plaintiff, there will be no expansion of the footprint, the number of dentists permitted to occupy the office is not regulated by ordinance, and the addition of one professional is consistent with the number of professionals in the other offices, the Board should not have determined that any approvals were necessary based on the nonconforming parking deficiency. Dr. Tsoucaris' parking nonconformity is a protected use that runs with the unit under the circumstances presented to the Board. See Dresner v. Carrara, 69 N.J. 237, 239-40, 353 A.2d 505 (1976) (holding that, where a property has been used for a certain business purpose with no off-street parking for years prior to passage of an ordinance requiring off-street parking, the continued use of the property without off-street parking becomes a legally protected nonconforming use); Wawa Food Mkt. v. Planning Bd. of Ship Bottom, 227 N.J. Super. 29, 37-38, 545 A.2d 786 (App.Div.) (holding that, "where the nature and intensity of the business remains the same, continued use of the property without offstreet parking is protected as a nonconforming use" (citing Dresner, supra, 69 N.J. at 240, 353 A.2d 505)), certif. denied, 114 N.J. 299, 554 A.2d 853 (1988).
We are mindful of the spirit of the law toward nonconforming uses. The uses may be continued as of right, N.J.S.A. 40:55D-68, but may not be enlarged as of right, Grundlehner v. Dangler, 29 N.J. 256, 263, 148 A.2d 806 (1959), and they are to be restricted rather than expanded, Belleville v. Parrillo's, Inc., 83 N.J. 309, 318, 416 A.2d 388 (1980). Moreover, as reiterated in Avalon Home & Land Owners Ass'n v. Borough of Avalon, 111 N.J. 205, 210, 543 A.2d 950 (1988), continuation of a nonconforming use can be permitted only if it is a continuance of substantially the same kind of use as that to which the premises were previously devoted, absent a variance. See also Grundlehner, supra, 29 N.J. at 263, 148 A.2d 806 (holding that nonconforming uses may not be enlarged as of right "except where the enlargement is so negligible or insubstantial that it does not fairly warrant judicial or administrative notice or interference"). We are convinced the record as presented *520 to the Board demonstrated that plaintiff's proposal would have such a negligible or insubstantial effect on the unit's use that the Board's finding of an expansion of a pre-existing nonconforming use requiring a variance was in error.
Even assuming otherwise, the Board's denial of the variance was arbitrary and not supported by the competent relevant evidence in the record. For the reasons expressed in large part by plaintiff's architect, planner and traffic engineer, as well as by the testimony of plaintiff and Dr. Tsoucaris, the application satisfied the requisite positive and negative criteria of N.J.S.A. 40:55D-70 d(2). Plaintiff established the positive criteria of "special reasons" for the variance, specifically the size and configuration of his office and the prior approval for seven operatories. See Sica v. Bd. of Adjustment, 127 N.J. 152, 156, 603 A.2d 30 (1992) (discussing the positive and negative statutory criteria for a variance). He also satisfied the negative criteria that the variance "`can be granted without substantial detriment to the public good'" and it "`will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.'" Ibid. (quoting N.J.S.A. 40:55D-70 d). Here, under all the circumstances, the proposal presented a very minor impact on the neighborhood. The permitted accessory professional office use was continued and, in fact, the use remained as a dental office. Dr. Tsoucaris clearly had the space to accommodate another dentist and their specialized practices were complementary in volume and length of patient treatment.
Although the Board is not bound to accept the testimony of the expert, its determination must be made on a rational and reasonable basis. Ocean County Cellular Tel. Co. v. Twp. of Lakewood Bd. of Adjustment, 352 N.J.Super. 514, 537, 800 A.2d 891 (App.Div.), certif. denied, 175 N.J. 75, 812 A.2d 1108 (2002). It is evident the Board accorded substantial weight to the testimony of the lay objectors, which largely focused on problems with parking, despite Peregoy's survey, which demonstrated there was ample parking available to accommodate an additional parking demand of only four spaces for the 1100 square footage plaintiff would be utilizing. Moreover, as Peregoy noted, his calculation of four spaces could possibly be reduced based on the specialized practices of plaintiff and Dr. Tsoucaris, which they testified to as involving a less intensive use than a typical dental office. Peregoy's survey, which was undisputed, generally relied upon data and accepted methodologies to support the traffic engineer's conclusions. Ibid.
The Board's reasons for rejecting the expert's parking testimony was based on a perception that the parking demand is greater on Mondays, Tuesdays and Thursdays without any evidential basis in the record. No witnesses testified about the days the medical offices were closed and that the resulting parking demand on Wednesdays and Friday was different than on any other day. The speculation by Board members that medical professionals routinely close their offices on Wednesdays and Fridays is totally unsupported by the record as to this complex. Peregoy reasonably surveyed the area on those days because plaintiff had been using the office on Wednesdays since 2005 and was planning to have office hours on Fridays. Even assuming the Board was correct that other medical offices were closed during that study period, plaintiff's office hours were to take place on the lowest parking demand days.
Moreover, no evidence was presented that the overnight winter parking ban would undermine the validity of the parking study. At most, the objectors' complaints *521 established that there would be no parking problem for five months of the year during the overnight ban. Similarly, no specific lay testimony or expert report was presented by the objectors to demonstrate that the utilization of the park or baseball field would adversely impact the parking demand. Nor was there discussion about their days and hours of use. In fact, Radoian, who was president of the little league, stated that the baseball field had its own parking lot and noted that the little league had previously leased space to medical professionals. If the Board were concerned about these issues, it easily could have given plaintiff the option of providing a supplemental traffic survey. Or, the Board could have retained its own traffic engineer or had its planner perform a traffic analysis. Instead, it arbitrarily disregarded the traffic survey.
Even accepting everything the objectors testified to regarding the parking shortage does not provide a basis under the law for the Board's rejection of plaintiff's application. The Fountainview residents all have designated parking at the complex and Ado also has off-street parking available in her neighborhood. That it may have been more convenient to pull up and park on the street in front of the condominium or single-family residence after running errands is not a substantial detriment. See Medici, supra, 107 N.J. 1, 22-23 n. 12, 526 A.2d 109 (stating that the "substantial detriment" prong of the negative criteria focuses on the impact of the variance on nearby properties and that "[t]he key word here is `substantially'" (citation omitted)). Both Anderson Avenue, on which Fountainview is located, and the abutting Forest Avenue, on which single-family residences are located, are public streets with no permit parking restrictions. Therefore, the parking spaces are available on those streets to anyone on a "first come, first served" basis. As to Ado's concern about her driveway being blocked by the cars parked on the street, which may or may not be those related to the professional offices, that is clearly a nuisance. However, that is an enforcement issue easily remedied by the Borough's issuance of tickets for the violation.
Wang was the only one to directly address the occasional noise. His testimony was vague and non-specific. Moreover, he was obviously aware that when he purchased his unit above a commercial office there might be some noise or inconvenience resulting from his location. A resident should expect a 2200 square foot professional office, permitted within the zone, to generate some noise during business hours. Even so, the record was devoid of evidence that the office will create any objectionable noise with two dental specialists seeing patients simultaneously. Thus, the record does not demonstrate that plaintiff's addition of one day to his schedule would create a substantial detriment to the public good.
We recognize that boards have local knowledge of the community and this is the reason for our general deference. Jock v. Zoning Bd. of Adjustment, 184 N.J. 562, 597, 878 A.2d 785 (2005). However, a board's decision still must have a factually substantiated basis, which was not demonstrated here.
Reversed.
NOTES
[1] On March 27, 2009, we granted the motion of intervenor, SJT Holdings, LLC, Dr. Tsoucaris' wholly-owned company, to participate in this appeal.
[2] Judge Sapp-Peterson did not participate in oral argument. However, the parties consented to her participation in the decision.
[3] Dr. Tsoucaris explained that, of the seven operatories, he put a couch and table for eating lunch in one and did not use the rear one.
[4] Dr. Haber's unit totals about 3600 square feet. Presumably, it was divided in some manner at the time.
[5] There is conflicting evidence in the record as to when plaintiff amended his application, either December 10, 2006, as stated by the Law Division judge, or March 26, 2007, as stated in plaintiff's supplemental application and in the Board's September 11, 2007 Resolution. Based on the discussions during the first two Board hearings, March 13 and April 11, 2007, it appears the variance application was filed in the interim. Moreover, the Board's planning consultant's supplemental letter of April 6, 2007 first references plaintiff's apparent requirement for a "d(2) variance. . . for expansion of a nonconforming use" due to nonconformity with section 410-35A(5)(a) of the ordinance, while the November 22, 2006 letter was silent on the issue. However, the Notice to Property Owners contained in the appendix states that it is an application "for variance approval" noting noncompliance with section 410-35A(5)(a), but references a public hearing scheduled for December 19, 2006. The record does not reflect a hearing held on that date, nor does it reflect any challenge to the notice.
[6] The application does not delineate between a "c" or "d" variance, N.J.S.A. 40:55D-70 c, d.
[7] Peregoy opined that the lower turnover in the specialized dental practices could potentially have less parking accumulation.
[8] He did not provide a first name and none has been referenced in the record.
[9] Generally, "a responding party is permitted to argue in opposition to the appeal any alternative basis for partial or full affirmance of the trial court's judgment." O'Brien (Newark) Cogeneration, Inc. v. Automatic Sprinkler Corp. of Am., 361 N.J.Super. 264, 271, 825 A.2d 524 (App.Div.2003), certif. denied, 178 N.J. 452, 841 A.2d 90 (2004). However, a respondent must cross-appeal to obtain relief from a judgment. State v. Elkwisni, 190 N.J. 169, 175, 919 A.2d 122 (2007). Accordingly, we will not address this issue.
[10] This case was directly certified by the Supreme Court from the Law Division.
[11] Business and professional offices are required to provide one parking space for each 250 square feet of floor space.
[12] There is insufficient documentation in the record to determine whether Dr. Tsoucaris' C.O. would have extended to his medical professional employees.